**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ETHAN C. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MARTIN MARIETTA MATERIALS, | ) | 1:18CV717 |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ethan C. Brown alleges that his former employer, Defendant Martin

Marietta Materials, Inc. ("Martin Marietta" or "the company") discriminated against

him in violation of the Americans with Disabilities Act ("ADA") and North Carolina

public policy and retaliated against him in violation of the Family Medical Leave Act

("FMLA"). This matter is before the Court on Martin Marietta's Motion for

Summary Judgment [Doc. #26]. For the reasons explained below, the motion is

granted in part and denied in part.

I.

The following facts are undisputed unless otherwise noted. On March 22,

2017, Martin Marietta terminated Brown's employment after his FMLA leave

expired because, as of that date, he remained under a driving restriction that

prevented him from operating a haul truck at the company's quarries after suffering

an epileptic seizure. (Decl. of Stacy Kerns ¶¶ 20-21 (Aug. 28, 2019) [Doc. #27-1];

Aff. of Ethan C. Brown ¶ 12 (Oct. 3, 2019) [Doc. #31].)

Martin Marietta owns and operates quarries at which it mines and refines natural resource-based building materials. (Id. ¶ 3.) The company's quarry operations remove large rock from the ground, transport it to facilities at the quarry to reduce and refine for use at construction sites, and load the material into customers' and distributors' vehicles. (Id. ¶ 4.)

Brown was hired in May 2014 as a part-time Utility Person at Martin Marietta's quarry in Woodleaf, North Carolina before his position became full-time in September 2014. (Id. ¶ 8; Employee Change Notice (May 27, 2014), Ex. 2 to Kerns Decl.[1]; Employee Change Notice (Sept. 1, 2014), Ex. 3 to Kerns Decl.; Dep. of Ethan C. Brown 24:21-25:2 (Aug. 1, 2019) [Docs. #27-3, #31-3[2]].)

On August 3, 2015, according to Brown's personnel file, his position changed to that of a Truck Driver-Heavy Off Highway. (Kerns Decl. ¶ 10; Employee Change Notification (Aug. 3, 2015), Ex. 4 to Kerns Decl.; Decl. of Dennis Hellard ¶ 3 (Aug. 27, 2019) [Doc. #27-2].) Martin Marietta considers the essential function of this position to be driving and operating a heavy equipment vehicle to move rock product about the facility. (Kerns Decl. ¶ 11.) The job description for the position of Truck Driver – Heavy Off Highway applicable to Brown, according to Kerns, summarized the position as follows:

> Responsible for driving/operating heavy equipment vehicle to move rock product to selected intake crushing/screening site and deposit load into intake area. Accountability of the safe and timely transportation of such loads will be imperative. The ability to operate

---

[1] Brown also submitted some of his Employee Change Notices. (See Doc. #31-4.)
[2] Each party submitted portions of Brown's deposition.

hand and foot controls in vehicle. Operative [sic] service equipment and perform regular maintenance on equipment. Perform daily inspection of vehicle at site. Perform pre-operation check of equipment and complete documentation.

(Job Description 2017-2984, Truck Driver – Heavy Off Highway, Ex. 5 to Kerns Decl.) The job description that Martin Marietta submitted to the EEOC differs from this in some respects:

Operate 40-50 ton haul trucks loaded with rock. Assist with maintenance in the quarry, and operation of pit and yard loaders. Perform a pre-shift inspection, minor maintenance, and repairs on the haul truck. Hours of operation are determined by customer demand. Must be able to work extended hours and Saturdays.

(Letter from Matt Bates to Rafael Nieves (Dec. 12, 2017), Ex. A to E. Brown Aff.)

At the time of his deposition, Brown testified that he could not recall when he began driving the haul trucks at the quarry or when he was trained to do so, but he did remember that he did not drive them when he started as a Utility Person in 2014. (Brown Dep. 31:11-13, 33:4-7, 33:20-22.) But, he estimated he started driving trucks in 2015 and remembered the training occurred at the Woodleaf facility with experienced drivers. (Id. at 33:8-35:15.)

In his affidavit in opposition to summary judgment, Brown maintains that no one told him that his position was changing from Utility Person to Truck Driver and that it was "[a]s a Utility Person [that he] learned to drive a truck." (E. Brown Aff. ¶ 8.) The job description for Utility Person that Martin Marietta provided to the EEOC and Brown quoted in his affidavit does describe "maintain[ing] . . . water truck to clean around plant equipment and to maintain roadways and parking

areas" and "operat[ing] a water truck to limit airborne dust" among other maintenance duties. (Letter from Bates to Nieves (Dec. 12, 2017); E. Brown Aff. ¶ 5.) It was not until Brown went out on FMLA leave that he saw his job title was Truck Driver. (Id. ¶ 9.) Until then, he believed he was a Utility Person, his job duties had not changed, and "everyone in the quarries was pretty much expected to do every type of job at the quarries." (Id. ¶¶ 8, 9.)

Brown, like other employees, was cross-trained "as a good business practice". (Hellard Decl. ¶ 6.) For example, he was trained to be able to fill in for the Weighmaster approximately two weeks a year when the full-time Weighmaster took vacation. (Id.) Brown avers that he was "called on to perform all variety of tasks that did not involve driving a truck or operating heavy equipment" and "continued to do whatever needed to be done on any particular day, including driving a truck [and] also all of the duties listed for a Utility Person." (E. Brown Aff. ¶ 8; see also id. ¶ 7.) However, Martin Marietta "did not expect that non-driving functions would or could become the exclusive job of employees who operated [its] heavy equipment." (Hellard Decl. ¶ 6.)

At his deposition, Brown could not recall how often he drove a truck and described covering for co-workers who were on vacation, at an appointment, or out sick. (Brown Dep. 44:2-25.) Nevertheless, he acknowledged that he drove a truck more often than he did anything else such as working as a Weighmaster, painting, doing lawn care, cleaning, inspecting fire extinguishers, or conducting maintenance. (Id. at 45:1-46:3.) Brown's plant manager, Dennis Hellard, described

driving as "the main function of [Brown's] job" and estimated that Brown "spent 85% to 90% of his time operating a truck", which he drove "nearly every day." (Hellard Decl. ¶¶ 2, 3, 5.)

Since childhood, Brown has had epilepsy which is controlled by medication. (Aff. of Renae Brown ¶ 2 (Oct. 3, 2019) [Doc. #32].) On December 24, 2016, he suffered an epileptic seizure for the first time in five years. (E. Brown Aff. ¶ 12; R. Brown ¶ 2.) His physician wrote a note seeking to excuse him from work from December 27 through December 30. (Letter from Dr. Jane Gibert Boggs (Dec. 27, 2016), Ex. D to E. Brown Aff. [Doc. #31-4].) Brown called Martin Marietta's Senior Human Resources Administrator for the Mid-Atlantic Division, Stacy Kerns, to tell her that he "was going to be out of work for six months due to epilepsy" and to inquire about FMLA leave. (Brown Dep. 66:19-67:10.) On December 28, Kerns sent Brown a copy of the company's Notice of Eligibility and Rights and Responsibilities Form pursuant to the FMLA, which Brown completed and returned the same day. (Kerns Decl. ¶ 12; Letter from Kerns to Brown (Dec. 28, 2016), Ex. 6 to Kerns Decl.); Employee Request for Family or Medical Leave (Dec. 28, 2016), Ex. 7 to Kerns Decl.).

Martin Marietta instructed Brown to note "on all the forms [he] submitted for FMLA and disability purposes" that he was a truck driver. (R. Brown Aff. ¶ 4.) Among the pre-printed bases upon which to seek leave, Brown selected "[f]or a serious health condition that makes me unable to perform the essential functions of

my job" with leave to start December 27, 2016 and an expected date of return "06/2017". (Id.)

As required, Brown's physician certified his serious health condition where it was noted that he was a Truck Driver – Heavy Off Highway with the essential job function of driving a truck. (Certificate of Health Care Provider (Jan. 9, 2017), Ex. 7 to Kerns Decl.[3]) She described that, as a result of Brown's epileptic seizure on December 24, he was "unable to drive for six months past the last seizure" and estimated that Brown was incapacitated from December 24, 2016 to June 24, 2016[4]. (Id.) He was prescribed medication, would need to attend follow-up appointments every three months, could suffer episodic flare-ups preventing him from performing his job functions, and was estimated to have a flare-up once a year. (Id.) On January 26, 2017, Martin Marietta approved Brown's FMLA request and granted him twelve weeks leave. (Kerns Decl. ¶ 15; Designation Notice (Jan. 16, 2017), Ex. 9 to Kerns Decl.) Brown was paid for eight weeks of that leave through Martin Marietta's Sickness and Accident Benefit policy, which provides "certain benefits to hourly employees who are approved for medical leave and are unable to work because of a non-occupational accident or sickness not covered by workers' compensation." (Kerns Decl. ¶¶ 15, 23.)

---

[3] Brown also submitted his physician's certification. (See Doc. #31-4.)

[4] The physician noted Brown's six-month period of incapacity as "12/14/16 – 6/24/16" because he suffered his seizure on December 14, 2016. The June 24, 2016 date appears by all reasonable inferences to be a typographical error.

Meanwhile, Brown's mother emailed a series of questions to Kerns on January 3 regarding Brown's leave. (Email from R. Brown to Kerns (Jan. 3, 2017), Ex. B to R. Brown Aff.)  His mother inquired if he would be eligible for his long-term disability benefit "since the doctor said no driving for 6 months" to which Kerns responded that he could "certainly apply for it" even though there was a six-month waiting period and they hoped he would be back to work then. (Id.)  His mother also asked, "What accommodations if any for Ethan are being discussed?  Who should we contact to discuss the possibility of accommodations?" (Id.)  She explained that Brown "would love to return to work" and reminded Kerns that Brown was trained and worked in several positions at the Woodleaf and Kannapolis quarries, including welding, maintenance, Weighmaster, and office duties. (Id.)  Kerns responded that, even though Brown wanted to work, his doctor said he could not work. (Id.)  Kerns explained that the company's doctor and the HR/Safety Manager, Kirk Grissett, "would be the ones to determine any accommodations", but "due to Ethan's request", Kerns had "not said anything to" them. (Id.)  She offered to discuss it with Grissett if Brown permitted her to do so and otherwise directed the Browns to contact Grissett directly. (Id.)  She also informed them that there was nothing else to do at that point other than to discuss Brown's illness with Hellar, the plant manager, and Grissett. (Id.)

In mid-February 2017, Brown spoke with Grissett about opportunities to return to work after his FMLA leave expired in March, but before Brown could drive a truck again. (E. Brown Aff. ¶ 13.)  He explained to Grissett that even though he

could not operate heavy equipment for six months, his doctor cleared him "to work and do the maintenance, be on the ground, wash down, weld, run the scales". (Brown Dep. 67:18-25.) Grissett repeatedly told Brown "that wasn't a job title". (Id. at 67:25-68:1.) Brown called Grissett "numerous" other times to inquire about job openings and "just to come and fill [in] – let somebody else run the truck in my place until the other three months were over", to "[s]ee if they would make accommodations for [him] to fill in or to do somebody else's work while they were doing another job." (Id. at 68:21-69:4, 73:7-13.) For example, he asked Grissett to assign him to the groundsman position where the groundsman would drive Brown's truck while Brown ran the scales, did the maintenance in the pit, and welded. (Id. at 69:12-70:7.) Brown also asked Grissett if he "could fill in for [the Weighmaster] while he was doing quality control", but Grissett "kind of left it hanging[;] [t]here wasn't really [an] answer to it." (Id. at 72:7-25.) Grissett either gave Brown "no straight answer", "kind of left it hanging", or told him no. (Id. at 68:21-69:11.) Brown asked whether there were any openings at the company's other facilities in Statesville, Hickory, Denver, Kannapolis, Pomona, and Reidsville and was told no. (Id. at 70:8-15.) Despite Brown's repeated inquiries of Grissett, the response was "there's no openings, that's not your job title." (Id. at 70:15-18; see also E. Brown Aff. ¶ 13.)

On February 19, Brown's mother emailed Kerns again and informed her that Grissett told Brown there were no accommodations available for his position. (Email from R. Brown to Kerns (Feb. 29, 2017), Ex. B to R. Brown Aff.) She asked

Kerns to describe Martin Marietta's compliance with the ADA in this situation and inquired further about Brown's long-term disability. (Id.) The Browns received no response. (E. Brown Aff. ¶ 14; R. Brown Aff. 9.)

On March 13, Brown received a letter from Grissett informing him that his FMLA leave was to expire on March 21, warning Brown that if he were "unable to return to work on March 22, 2017 [his] employment with Martin Marietta [would] be terminated", and inviting him to contact Grissett if he had any questions or concerns. (Letter from Grissett to E. Brown (Mar. 10, 2017), Ex. D to E. Brown Aff.; E. Brown Aff. ¶ 16.) Brown contacted Grissett and inquired about his long-term disability, but was told "they weren't going to consider that." (Brown. Dep. 68:10-14; 80:16-25.) Brown's mother also emailed Kerns and Grissett and noted that they had not received any answers to their questions from February 19 even though Brown's FMLA leave was to expire on March 21. (Email from R. Brown to Kerns & Grissett (Mar. 14, 2017), Ex. B to R. Brown Aff.) She expressed concern that Martin Marietta "would not/could not make accommodations even though[] Ethan submitted accommodation requests multiple times since January and each time was told that there were no accommodations available." (Id.) She once again inquired about Brown's long-term disability benefits. (Id.) She concluded by telling Kerns and Grissett that Brown had begun the process of filing a charge of discrimination against Martin Marietta with the EEOC. (Id.) On March 16, Grissett responded that, among other things, an enrollment packet for long-term disability

had recently been mailed to Brown. (Email from Grissett to R. Brown (Mar. 16, 2017) [Doc. #31-4].)

In his affidavit in opposition to summary judgment, Brown avers that he could have returned to work at the expiration of his FMLA leave with reasonable accommodations including, "(a) temporary assignment as a welder, mechanic, weigh master, utility person, office worker, laborer, or groundsman at any of approximately 30 locations in central North Carolina, then full responsibilities without accommodations after 90 days; (b) transfer to a similar open assignment at any of 30 or more locations; (c) providing an additional finite amount of unpaid leave." (E. Brown Aff. ¶ 18.)  Yet, he "was never given an opportunity to discuss or explore any of these possibilities because [Martin Marietta] refused to engage in the interactive process at all", all while "stonewall[ing] and fail[ing] to respond". (Id. ¶ 17.)

In contrast to the stonewalling and silence Brown describes, Martin Marietta contends that it was working to try to accommodate him.  "During the time of Brown's FMLA leave, Martin Marietta investigated whether there was any way to accommodate Brown's driving restriction", but because "driving was an essential function of Brown's job as a truck driver, there was no way to return [him] to his position during the period of his restriction." (Kerns Decl. ¶ 16.)

On February 20, 2017, Grissett completed a Reasonable Accommodation Analysis in which he checked "No" when asked if leave would be an adequate accommodation, if modifications to non-essential job functions could be made, if

there were open jobs Brown could perform in light of his restrictions, and if any other alternative accommodations were considered. (Reasonable Accommodation Analysis [Doc. #32-5].)

The company "evaluated whether Brown could transfer to any other vacant job of equivalent pay and status, or even lesser pay and status, during the time in which his driving restriction was in effect." (Kerns Decl. ¶ 17.)  However, Brown was not qualified for any position that was or became available between January 1, 2017 and June 30, 2017 at Woodleaf or Denver, Kannapolis, Pomona, and Hickory, facilities that were geographically proximate to Woodleaf, North Carolina. (Id. (citing Ex. 10 to Kerns Decl.).)  All but one position required the operation and driving of heavy machinery, either as a Haul Unit, Loader, Yard Loader, or Truck Driver. (Id. ¶ 18; see also Ex. 10 to Kerns Decl.)  The other position was a 2nd Shift Production/Plant Leadperson that opened in May, but the position required at least one year of supervisory or leadership experience. (Id. ¶ 19.)  Brown had no such previous experience nor any while at Martin Marietta. (Id.)

As for Brown's requests to reassign job duties, Hellar averred that attempting to assign responsibilities so that Brown did not drive a truck "would have disrupted [the company's] operations, would have introduced confusion about job responsibilities, and ultimately would have risked the safety of [the company's] operations." (Hellar Decl. ¶ 7.)  During Brown's absence, Martin Marietta did "alternatively assign[] driving duties to supervisory personnel, assign[] truck drivers from other facilities to the Woodleaf facility, and requir[e] existing truck drivers to

perform additional driving duties." (Id. ¶ 8.)  However, these "[c]hanges in assignments place stress on employees, often require the payment of additional overtime wages, and disrupt operations that are not a sustainable way to account for an employee's absence." (Id.)  The company also "could not simply hire a temporary worker to drive a truck in Mr. Brown's absence" "[b]ecause of the complexities and dangers of quarry operations". (Id.)  As a result, "[s]hortly after Martin Marietta terminated Brown's employment, it hired a new full-time equipment operator at the Woodleaf facility so that it could end these additional burdens and disruptions." (Id. ¶ 9.)

Martin Marietta terminated Brown on March 22, 2017 after an email exchange among Grissett, Kerns, and the Director of Human Resources Matt Bates in which Kerns asked if she was to terminate Brown or place him in unpaid status. (Emails among Kerns, Grissett, Bates (Mar. 22, 2017) [Doc. #32-6].)  Bates instructed Kerns to terminate Brown. (Id.)  The company has a "policy and practice to terminate the employment of individuals who do not return to work after their approved medical leave has ended if there are no reasonable accommodations available that would enable the employee to return to work and no alternative positions are available." (Kerns Aff. ¶ 22.)

Brown alleges that Martin Marietta discriminated against him based on his disability by terminating his employment (Count I[5]) and failing to accommodate his

---

[5] In paragraph 34 of the Complaint, as part of Count I—Disability Discrimination (Termination), Brown alleges that he was terminated in retaliation for exercising his

disability (Count II) all in violation of the ADA, retaliated against him in violation of the FMLA (Count III), and wrongfully discharged him in violation of North Carolina's public policy (Count IV). Martin Marietta has moved for summary judgment on all counts.

## II.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[6]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable

rights under the ADA and advising Martin Marietta that he was filing an EEOC charge. Martin Marietta has not moved for summary judgment on this retaliation claim, to the extent one is alleged.

[6] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

jury, based on the evidence, could find in favor of the non-moving party. Id. at

248. The materiality of a fact depends on whether the existence of the fact could

cause a jury to reach different outcomes. Id. The court cannot weigh the

evidence, fail to credit contradictory evidence, or make credibility determinations.

Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651 (4th Cir. 2018).

### III.

Under the ADA, a covered employer is prohibited from discriminating

"against a qualified individual on the basis of disability". 42 U.S.C. § 12112(a). A

"qualified individual" is defined as "an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position

that such individual holds or desires." 42 U.S.C. § 12111(8). As is relevant here,

discrimination not only includes termination, 42 U.S.C. § 12112(a), but also the

failure to make "reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability who is an . . .

employee", 42 U.S.C. § 12112(b)(5)(A).

### A.

A reasonable accommodation is a "[m]odification[] or adjustment[] to the

work environment, or to the manner or circumstances under which the position

held . . . is customarily performed, that enable[s] an individual with a disability who

is qualified to perform the essential functions of that position". 29 C.F.R.

§ 1630.2(o)(1)(ii)[7].  A job function "may be essential because the reason the position exists is to perform that function". 29 C.F.R. § 1630.2(n)(2).  Whether a function is essential is determined by, but not limited to, the "(i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the [employee] to perform the function . . . ." 29 C.F.R. § 1630.2(n)(3).  Essential job functions do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Reasonable accommodations that allow an employee to perform the essential functions of his position may include job restructuring, 42 U.S.C. § 12111(9)(B), by "reallocating or redistributing nonessential, marginal job functions", 29 C.F.R. § 1630.2(o) App.; reassignment to a vacant position, 42 U.S.C. § 12111(9)(B); or "the use of accrued paid leave or prov[ision] [of] additional unpaid leave for necessary treatment", 29 C.F.R. § 1630.2(o) App.  "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation" that "identif[ies] the precise limitations

---

[7] The Fourth Circuit Court of Appeals considers these regulations to be "interpretive guidelines for the ADA". <u>Myers v. Hose</u>, 50 F.3d 278, 283 (4th Cir. 1995); <u>cf. Jacobs v. N.C. Admin. Office of the Cts.</u>, 780 F.3d 562, 579 n.18 (4th Cir. 2015) (assuming the regulations' "reasonableness and declin[ing] to determine what level of deference, if any, they are due" because the parties agreed that the regulations were instructive).

resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

"[T]o establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: (1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013) (internal quotations omitted) (alterations in original).

### 1.

There is no dispute as to the first two elements. (See Br. in Supp. of Def.'s Mot. for Summ. J. ("Br. in Supp.") at 10 [Doc. #27].)  Instead, Martin Marietta argues that driving was the essential function of Brown's job, there were no vacant positions with duties that Brown could perform and for which he was qualified, his proposed reallocation of job duties was not reasonable, and Martin Marietta was not required to provide Brown an indefinite leave of absence. (Id. at 11-19.)

In response, Brown contests the assertion that driving was an essential function of his position because he maintains that the parties disagree about whether Brown was a Utility Person or Truck Driver at the relevant time. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [corrected] ("Pl.'s Opp'n") at 10-13

[Doc. #33].)  He also argues that there is a question of fact about whether Martin

Marietta satisfied its obligation to engage in the interactive process with Brown to

find a reasonable accommodation. (Id. at 13-20.)  Finally, he argues that there is

evidence that there were reasonable accommodations available – returning Brown

to work as a Utility Person for ninety days, assigning him to a non-driving position

at one of the company's thirty facilities relatively nearby, or affording him a finite

amount of unpaid leave. (Id. at 21-23.)

First, there appears to be no dispute that the essential function of the Truck

Driver – Heavy Off Highway is driving a truck, as evidenced by both job

descriptions applicable during the relevant period and the declarations of Martin

Marietta's Senior Human Resources Administrator for the Mid-Atlantic Division and

Brown's Woodleaf Plant Manager.

However, Brown attempts to create a dispute about whether or not his

position was that of a Truck Driver – Heavy Off Highway or a Utility Person.  Yet,

there is no genuine dispute about this.  It is true that the job description for Utility

Person includes the operation of a water truck.  However, Brown was hired as a

Utility Person in 2014 and estimated that he began driving haul trucks in 2015

which is when his personnel file reflects that he became a Truck Driver.  In his

affidavit in opposition to summary judgment, he maintains that his job duties never

changed, though, despite his deposition testimony to the contrary.  "A genuine

issue of material fact is not created where the only issue is to determine which of

the two conflicting versions of the plaintiff's testimony is correct." Barwick v.

<u>Celotex Corp.</u>, 736 F.2d 946, 960 (4th Cir. 1984).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." <u>Id.</u>

Furthermore, Brown's personnel file consistently documented his job changes, and Brown has not taken issue with the content of any of those documents and even submitted some of his Employee Change Notices himself. The May 27, 2014 Employee Change Notice reflects Brown's "New Hire" as a part-time Utility Person.  The September 1, 2014 Employee Change Notice evidences Brown's move from a part-time Utility Person to full-time Utility Person. Critically, the August 3, 2015 Employee Change Notice reflects Brown's change in position from Utility Person to Truck Driver.

In addition, when Martin Marietta had to adjust for Brown's absence, it did so by redistributing his <u>driving</u> duties by assigning driving duties to supervisors, assigning truck drivers from other facilities to Woodleaf, and requiring existing truck drivers to perform additional driving duties.  Consequently, soon after Brown's termination, Martin Marietta hired a new full-time equipment operator. These are not actions Martin Marietta would have taken if Brown were anything other than a Truck Driver.  Brown even acknowledged that he drove a truck more than he performed any other function.  Neither the fact that Brown was unaware of his change in positions nor that he performed other duties creates a genuine

dispute about Brown's position. As of March 2017, Brown was a Truck Driver, the essential function of which was driving trucks.

There are genuine disputes of material fact, though, about the existence of reasonable accommodations, whether Martin Marietta satisfied its duty to participate in good faith in an interactive process to identify reasonable accommodations, and whether those reasonable accommodations would cause Martin Marietta undue hardship.

On the one hand, Martin Marietta was not required to reallocate the essential job function of a Truck Driver – driving a truck – so that Brown could perform the position's marginal functions, nor was it required to move others out of their positions so that Brown could perform their jobs. 29 C.F.R. § 1630.2(o) App. ("An employer . . . is not required to reallocate essential functions."). Similarly, while job restructuring may be a reasonable accommodation, such restructuring involves reallocating "nonessential, marginal job functions". Id. After all, a reasonable accommodation "is one that 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position.'" Jacobs, 780 F.3d at 581 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)) (alterations in original) (emphasis added). Furthermore, Brown's "identifying specific, isolated tasks he could have performed despite his physician's restrictions is not sufficient", Fields v. Clifton T. Perkins Hosp., No. RDB-12-3254, 2014 WL 2802986, at *5 (D. Md. June 19, 2014), aff'd, 605 F. App'x 200 (4th Cir. June 3, 2015), because Martin Marietta was not required to create a new position for him, Dicksey v. New Hanover Cty.

19

Sheriff's Dep't, 522 F. Supp. 2d 742, 748 (E.D.N.C. 2007) (citing Lamb v. Qualex, Inc., 33 F. App'x 49 (4th Cir. Apr. 3, 2002)).

On the other hand, reassigning an employee to a vacant position may be a reasonable accommodation.  There is no dispute that there were no vacant positions at Woodleaf, Denver, Kannapolis, Pomona, or Hickory from January 1, 2017 to June 30, 2017 for which Brown was qualified that were not heavy equipment operators.  Yet, Brown asked Grissett if there were openings at other facilities, including Statesville and Reidsville, and was told no.  Furthermore, Brown testified that he was willing to return to work at "any location in the Greensboro district" and then averred that he would have transferred to any of Martin Marietta's thirty facilities from Raleigh to Charlotte.  None of these other facilities are listed on the chart of open positions that Martin Marietta produced in discovery that reflected its evaluation of vacant positions at other facilities.

Also, providing additional, finite unpaid leave for necessary treatment may be a reasonable accommodation. 29 C.F.R. § 1630.2(o) App.  Under Fourth Circuit precedent, "a leave request will not be unreasonable on its face so long as it (1) is for a limited, finite period of time; (2) consists of accrued paid leave or unpaid leave; and (3) is shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question." Wilson, 717 F.3d at 345 n.8. Cf. Myers, 50 F.3d at 283 (describing the ADA as "framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation" and holding "that reasonable accommodation

does not require the [employer] to wait indefinitely for [the individual's] medical conditions to be corrected, especially in light of the uncertainty of cure"). "The employee must show that had he been granted leave, at the point at which he would have returned from leave, he could have performed the essential functions of his job." Wilson, 717 F.3d at 346. "In determining whether leave would or would not have enabled an individual to perform the essential functions of a position, it is improper to consider . . . evidence of the individual's abilities beyond his or her proposed return date." Id. at 346 n.8 (finding that "evidence Wilson later suffered an additional medical setback and could not return to work until a year later, is irrelevant to the question of whether he could have performed the essential functions of his position if given two days of leave").

Martin Marietta argues that affording Brown leave[8] was not a reasonable accommodation "because it would have done nothing to allow Brown to perform the essential functions of his job." (Br. in Supp. at 14.) The company is under the impression that Brown would have needed an "indefinite leave of absence" (emphasis added), because it reads Brown's FMLA documentation to show "Brown's return to work was uncertain – six months after the date of his last

---

[8] To the extent that Martin Marietta distinguishes Brown's request for long-term disability from a request for unpaid leave so that it may argue that the latter is a "new proposal" raised during discovery that should be foreclosed, such an argument misunderstands the employer's duty to participate in the interactive process as it is explained below. Furthermore, Grissett was aware as of February 20, 2017 that leave was a possible accommodation when he completed the Reasonable Accommodation Analysis.

seizure" and relies on Brown's possible "episodic flare-ups". (Id. at 14-17.)
"Martin Marietta did not believe that there was a definite date on which Brown
could have returned to work". (Kerns Aff. ¶ 28.) Yet, in a Disability Analysis
completed on February 20, 2017, Grissett was asked how long Brown's
impairment would last, to which he responded, "Employee is unable to drive for six
months past the last seizure. 12/24/16 to 6/24/2017." (Disability Analysis (Feb.
20, 2017) [Doc. #32-5].) This parallels Brown's physician's statement that he
was "unable to drive for six months past the last seizure", which occurred on
December 24, 2016, and estimated the end of his period of incapacity to be June
24, 2017.[9] There is nothing indefinite about that date. Brown's driving restriction
was apparently lifted that June, (see Brown Dep. 128:21-22), such that he could
have performed the essential functions of his job as a Truck Driver at the point at
which he would have returned from leave had it been granted. That Brown may
have had flare-ups after June that would have necessitated a subsequent driving
restriction is not relevant to the question of whether he could have driven a truck if
given unpaid leave through June 2017.

In sum, as required, Brown has "present[ed] evidence from which a jury may
infer that the [proposed] accommodation is 'reasonable on its face, i.e., ordinarily
or in the run of cases.'" Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 414
(4th Cir. 2015) (quoting Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454,

---

[9] See supra n.4.

464 (4th Cir. 2012)) (second alteration in original); <u>see also</u> <u>id.</u> (describing a reasonable accommodation as "feasible or plausible").

2.

The focus now turns to Martin Marietta and any undue hardship these possible reasonable accommodations would have imposed on the company. <u>See</u> <u>id.</u> ("Courts have reconciled and kept distinct the 'reasonable accommodation' and 'undue hardship' requirements by holding that, at the summary judgment stage, the employee need only show that an accommodation seems reasonable on its face, and then the employer must show special (typically case-specific) circumstances that demonstrate undue hardship.") (international quotations omitted). If a reasonable accommodation "would impose an undue hardship on the operation of the business" of the employer, then the employer is not required to provide that accommodation. 42 U.S.C. § 12112(b)(5)(A). An undue hardship exists when an action requires

> significant difficulty or expense when considered in light of . . . (i) the nature and cost of the accommodation . . . ; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(A), (B); see also 29 C.F.R. § 1630.2(p)(2)(v) (describing the "impact of the accommodation upon the operation of the facility" as "including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business").

According to Brown's affidavit, Martin Marietta has "over 8,500 employees in 27 states, Canada, and the Bahamas." (E. Brown Aff. ¶ 4.) It "operate[s] 282 aggregates quarries, mines and yards, and over 150 other facilities, such as concrete plants, with annual revenues of nearly $4 billion." (Id.) Brown estimated that there were thirty facilities in the Raleigh-Charlotte region. On the other hand, the company only "employs on average a dozen or more individuals (depending on the quarry size) to conduct the operations of the quarry." (Kerns Aff. ¶ 5.) The Woodleaf facility had sixteen employees. (Id.) Both Kerns and Hellard averred that the company had to "assign[] driving duties to supervisory personnel, assign[] other truck drivers to the facility, and/or requir[e] existing truck drivers to perform additional driving duties" during Brown's absence, "often" resulting "in additional expenditures on overtime compensation" and additional "significant stress to individual employees and the operation of the facility." Hellard did not consider this to be "a sustainable way to account for an employee's absence." (Hellard Aff. ¶ 8.) This evidence shows a genuine dispute of material fact as to whether any of Brown's accommodations that may be reasonable cause Martin Marietta undue hardship in light of the operations of Martin Marietta, the nature and cost of the accommodation, the financial resources of the Woodleaf facility and the company

as a whole, the number of employees at each facility, and the number and location of the company's other facilities, among other factors.

3.

There is also a genuine dispute about whether Martin Marietta met its obligation to participate in the interactive process to identify a reasonable accommodation.  "The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation." Jacobs, 780 F.3d at 581 (quoting Wilson, 717 F.3d at 346) (alteration in original).  "This duty is triggered when an employee communicates [his] disability and desire for an accommodation – even if the employee fails to identify a specific, reasonable accommodation." Id. (citing Wilson, 717 F.3d at 346).  Of course, if there is no "reasonable accommodation that would allow [the employee] to perform the essential functions of the position", then "an employer will not be liable for failure to engage in the interactive process". Id. (citing Wilson, 717 F.3d at 347).

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir.

Apr. 20, 2011) (quoting Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130,

1135-36 (7th Cir. 1996)).

Beginning as early as January 3, Martin Marietta was made aware of

Brown's desire to return to work with reasonable accommodation when his mother

asked what reasonable accommodations were being discussed and with whom she

and Brown should talk about reasonable accommodations because he would love

to return to work.  As directed, Brown and his mother spoke with Grissett who

repeatedly told Brown "that wasn't a job title" when Brown suggested various jobs

he could perform and, other times, Grissett gave Brown "no straight answer",

"kind of left it hanging", or told him no.  Despite a follow-up email from Brown's

mother to Kerns in mid-February about accommodations and long-term disability

benefits, they received no response.  It was not until mid-March that anyone

responded, and it was by way of a letter from Grissett informing Brown that his

FMLA leave was expiring, warning him that he would be terminated if he could not

return to work on March 22, and inviting questions or concerns.  When Brown

inquired again about long-term disability, Grissett said the company was not going

to consider that.  Brown's mother emailed Kerns and Grissett on March 14, noted

that the Browns had received no response to their questions from February, and,

each time the company had responded to inquiries, the response was that there

were no accommodations available.  On March 22, 2017, Brown was terminated.

There is no dispute that Brown made Martin Marietta aware of his disability and his desire to return to work, and this triggered the company's duty to engage in good faith with Brown to identify a reasonable accommodation. Brown even proposed possible accommodations, albeit not all reasonable ones. Yet, as explained above, a reasonable jury could find that there were reasonable accommodations available. Therefore, although Kerns and Grissett did communicate with Brown and his mother during his absence, a jury could find from the substance of the communications and, at times, the absence of communication that Martin Marietta breached its duty of good faith to engage with Brown in an interactive process to identify a reasonable accommodation.

In sum, genuine disputes of material facts as to Brown's claim that Martin Marietta violated the ADA by failing to provide him reasonable accommodation preclude summary judgment on Count II.

B.

A claim that an employer violated the ADA by terminating an employee requires the employee to prove "(1) that [he] has a disability, (2) that [he] is 'a qualified individual' for the employment in question, and (3) that [his employer] discharged [him] (or took other adverse employment action) because of [his] disability." Jacobs, 780 F.3d at 572.[10] Martin Marietta maintains that, at the time

---

[10] Martin Marietta proposes using the burden-shifting scheme from McDonnell Douglas applied "in a typical discharge case brought under the ADA". (Br. in Supp. at 9 (quoting Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995)). Ennis involved an employee allegedly terminated for numerous job

of his termination, Brown was not a qualified individual because there was no reasonable accommodation that would allow him to perform the essential functions of his job as a Truck Driver. (See Br. in Supp. at 16.)

In its Reply Brief, Martin Marietta contends that Brown has waived his disparate treatment claim because he failed to respond to the company's summary judgment arguments. However, although Brown expounds more fully on his reasonable accommodation claim, he does rely on some of the same arguments and facts to support his termination claim by focusing on whether Brown was a qualified individual. (See Pl.'s Opp'n at 10 (providing law on discharge claims under the ADA and the requirement that the individual be a qualified individual), 13 (referring to "both the ADA discrimination and failure-to-accommodate claims" in the context of the interactive process).)

There is no dispute that Brown had a disability. And, there is no dispute that Martin Marietta terminated him on March 22, 2017 at the expiration of his FMLA leave because he could not drive a truck as proscribed by his physician.[11]

---

performance issues, but who claimed she was discharged because of her disability, facts distinguishable from this atypical case where there is direct evidence that Brown was discharged because of his disability.

[11] At his deposition, Brown testified that Martin Marietta afforded five employees three to six months of leave for injuries or surgeries and allowed them to return to work, while it denied Brown the same leave and terminated him instead. (Brown Dep. 100:14-105:5.) However, as Kerns averred, these individuals, like Brown, were eligible for paid leave under the company's Sickness and Accident Benefit Plan based on their years of continuous service. (Kerns Aff. ¶ 24.) Two employees with thirty-nine years and sixteen years of service were eligible for twenty-six weeks of paid leave but used eight and seven, respectively. (Id. ¶ 25.) One employee with seventeen years of service took all twenty-six weeks of paid leave,

Thus, the issue is whether Brown was a qualified individual at the time of his termination. Because there are genuine disputes of material fact as to whether there were reasonable accommodations available such that Brown would have been a qualified individual at the time of his termination, summary judgment on Count I is precluded.

IV.

Martin Marietta also moved for summary judgment on Brown's claim of retaliation in violation of the FMLA. A plaintiff claiming FMLA retaliation "must first make a prima facie showing that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006). The employer must then offer a non-discriminatory explanation for the termination, after which the plaintiff must show that the explanation is pretextual. Id. Martin Marietta argues that Brown cannot show the causal connection between his FMLA leave and his termination and, even if he could, he cannot rebut the company's legitimate, non-retaliatory reason for terminating him – because he could not return to work at the expiration of his FMLA leave, he was terminated per company policy. (Br. in Supp.

---

but chose not to return to work. (Id.) Two employees suffered work-related injuries, and, thus, did not fall under the company's Sickness and Accident Benefit Plan. (Id.) One of them was out of work for five weeks, and the other missed no work. (Id.) Although this evidence does not show disparate treatment, there is direct evidence that Brown was terminated because of his disability. The issue is, thus, whether he was a qualified employee at the time.

at 21-22.)  According to Martin Marietta, "whether or not [it] accurately concluded that there was no accommodation available to Brown . . . , there is no evidence whatsoever that [it] terminated Brown's employment because he exercised his rights under the FMLA." (Id. at 21-22.)

As Martin Marietta argues in its Reply Brief, Brown has neglected to respond at all in opposition to the company's motion for summary judgment on this claim. (See generally Pl.'s Opp'n.)  However, "summary judgment cannot be granted by default . . . ." Fed. R. Civ. P. 56(e) advisory committee's note to 2010 amendment.  "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'" Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (quoting then-Fed. R. Civ. P. 56(c)).  The court "must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Id.

Assuming Brown could make a prima facie case of retaliation in violation of the FMLA, Martin Marietta has proffered a legitimate, non-retaliatory reason for Brown's termination.  Its company policy is to terminate employees who cannot return to work at the expiration of their FMLA leave, and it did not deviate from that policy.  There is no record evidence to show that this proffered explanation is pretextual.  Accordingly, summary judgment on Count III is appropriate.

V.

As Martin Marietta notes, to the extent that Brown's state claim of wrongful discharge is asserted pursuant to the North Carolina Persons with Disabilities Protection Act, N.C. Gen. Stat. § 168A-1 et seq., this portion of Count IV fails as a matter of law because it arises from the same facts and circumstances as his ADA claims. See N.C. Gen. Stat. § 168A-11(c) ("No court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial . . . proceedings under . . . the Americans with Disabilities Act . . . involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter."); Cone ex rel. Cone v. Randolph Cty. Sch., 302 F. Supp. 2d 500, 514 (M.D.N.C. 2004) (applying N.C. Gen. Stat. § 168A-11(c) to dismiss the North Carolina Persons with Disabilities Protection Act claim as a matter of law).

However, to the extent that Brown's wrongful discharge claim is based on a violation of North Carolina's Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2, the claim will rise or fall with Brown's ADA claims and, therefore, summary judgment on this portion of Count IV is not appropriate.

VI.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant Martin Marietta Materials, Inc.'s Motion for Summary Judgment [Doc. #26] be granted in part and denied in part. It is granted in part as to Count III (retaliation in violation of FMLA) and the portion of Count IV alleging a

31

violation of the North Carolina Persons with Disabilities Protection Act.  It is denied in part as to Count I (termination in violation of ADA), Count II (failure to accommodate in violation of the ADA), and the portion of Count IV alleging a violation of North Carolina's Equal Employment Protection Act.

This the 24th day of February, 2020.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge